**UNITED STATES DISTRIT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-78 (RBW)** |
| **JEROD BARGAR,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jerod Bargar to six months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory assessment of $100 for the felony conviction. The government's request reflects the high end of Bargar's advisory Guidelines range (0-6 months of incarceration).

## I. INTRODUCTION

The defendant, Jerod Bargar, a 37-year old resident of Centralia, Missouri, traveled to Washington, D.C. and participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] When

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Bargar unlawfully entered and remained in the Capitol's restricted area, he carried a loaded firearm, which at some point fell to the ground and was later recovered by a Metropolitan Police Department ("MPD") officer on the Capitol's West Plaza. Furthermore, although the government does not have evidence that Bargar entered the Capitol building itself on January 6th, by his own admission, Bargar advanced deep enough into the Capitol's restricted area to notice tear gas and other munitions.

The government recommends that the Court sentence Bargar to six months of incarceration for his violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A). This sentence reflects the gravity of Bargar's conduct—bringing a loaded firearm onto restricted Capitol grounds in the midst of a violent riot.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 30, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Bargar's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Bargar traveled from his home in Centralia, Missouri to Washington,

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

D.C. with a friend to attend former President Donald Trump's "Stop the Steal" rally. On the morning of January 6th, Bargar and his friend attended the "Stop the Steal" rally at the Ellipse, near the National Monument.



*Image 1: Bargar in Front of Washington Monument*

By approximately 1:14 p.m., Bargar had made his way onto restricted Capitol grounds on the West side of the Capitol, coming close to police barricades set up along the West Plaza.



*Image 2: Bargar on the West Plaza*

Only 20 minutes prior to Bargar's appearance on the West side of the Capitol, the outer perimeter of restricted Capitol grounds had been breached, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol—including Bargar. At 2:03 pm—about 45 minutes after Bargar had entered restricted grounds on the West side—MPD officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. The order began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because

4

many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable. Several gaps appeared in the police defensive line at the West Front and a general retreat was called. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Bargar was amidst the hundreds of rioters opposite the struggling police lines on the West

Plaza.



*Image 4: Bargar on the West Plaza Holding American Flag*



*Image 5: Bargar Across from a Police Line on West Plaza*

A review of open-source and body-worn camera ("BWC") material does not show that Bargar went inside the Capitol or engaged in violence during the riot. However, at approximately 2:30 p.m., MPD Lieutenant ("Lt.") J.B. spotted a FNH 9-millimeter semi-automatic pistol, model FNX-9 on the ground of the West Plaza.



*Image 6: MPD Officer Pointing to Firearm on Ground*

Lt. J.B. picked up the firearm, which was in a distinctive waistband holster displaying the American flag and the words, "We the People."



*Image 7: MPD Officer Holding the Recovered FNH 9-Millimeter Semi-Automatic Pistol*

MPD later processed the firearm, noting that it was loaded, with 17 rounds in the magazine.



*Image 8: MPD Processing Photo of the FNH 9-Millimeter Semi-Automatic Pistol*

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted a search to determine the firearm's ownership based on its serial number. The firearm was not initially identified as belonging to Bargar. However, further investigation led law enforcement to identify Bargar as the true owner.

The ATF's search of the ownership of the firearm returned a result for an individual named D.F. On June 14, 2021, FBI agents interviewed D.F. at his home in Missouri. D.F. told the agents that he had not owned the firearm for several years and could not remember if he had sold it or pawned it. D.F. stated that he pawned several of his firearms at a specific pawn shop located in Jefferson City, Missouri.

On June 16, 2021, FBI agents interviewed B.P., an employee of the aforementioned pawn shop. B.P. informed the agents that D.F. had pawned the firearm to the shop in November 2011, and that subsequently in the same month, the firearm was purchased by R.N.

On July 13, 2021, FBI agents interviewed R.N. at his home in Missouri. R.N. confirmed that the firearm had previously belonged to him, and that he had given the firearm to his stepson, Jerod Bargar, approximately a year and a half prior to the interview.

C.     **Bargar's Statements Regarding January 6th**

During the day on January 6th, Bargar posted about his participation in the riot on social media. Specifically, Bargar posted on Facebook: "There's patriots and traitors, where do you stand?"



*Image 9: Facebook Post*

In another post, Bargar uploaded a picture of himself among a group of other rioters captioned:

"#FightForTrump #Parciallypeacefulprotect #partofhistory."



*Image 10: Facebook Post*

On January 7th, Bargar made the below picture his "cover" photo on his Facebook profile:



*Image 11: Facebook Post*

10

On January 18, 2021, FBI interviewed Bargar regarding his participation in the riot. During the interview, Bargar admitted to traveling to Washington, D.C. to participate in a political rally, but downplayed his conduct, saying that he knew where the line was and did not cross it. Bargar also stated that it was clear the USCP were trying to keep people from entering the Capitol, and that he was adjacent to a woman shot with "rubber pellets." At the time the interview occurred, FBI had not yet traced the recovered gun back to Bargar, and Bargar did not mention bringing a gun to D.C.

The FBI interviewed Bargar again on July 13, 2021.  During that interview, FBI confronted Bargar about the gun that MPD had recovered on the West Plaza, that was now traced back to Bargar. Bargar positively identified the firearm as his. In response to FBI questions regarding the firearm, Bargar told agents he is always armed and wanted to be armed when he went into the "belly of the beast" for his own "self-protection." According to Bargar, he did not intend to use the firearm unless he had to defend himself. He claimed that he was not aware that possession of a gun in D.C. was illegal. He also stated that he did not tell the FBI agents about the gun during his initial interview because he was not asked about it specifically, and figured it had likely been picked up by someone in the crowd since law enforcement officials had not contacted him about it.

### III.    THE CHARGES AND PLEA AGREEMENT

On July 29, 2022, Bargar was charged by complaint with four counts, including Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A). On June 8, 2023, Bargar entered a guilty plea to that offense pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Bargar now faces sentencing on his conviction for the charge of Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(1) and (b)(1)(A).   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Bargar faces up to 10 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 36. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 6, Bargar's Guidelines range is 0 to 6 months of imprisonment. The plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. ECF No. 29.   Specifically, the calculation is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | +4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Possession of Dangerous Weapon | +2 |
| | Total | 8 |

Given that Bargar is pleading guilty and accepting responsibility, the parties have agreed that a two-level reduction is appropriate, bringing the calculation to an adjusted offense level of 6.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. By its express terms,

§ 4C1.1 does not apply in this case because Bargar possessed a firearm in connection with the offense. *See* U.S.S.G. § 4C1.1(a)(7).

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration at the high end of the guidelines range.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bargar's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Here, Bargar attended the "Stop the Steal" rally near the Washington Monument and proceeded to the Capitol, where he entered the restricted grounds. While on restricted grounds, Bargar carried a loaded gun. At some point during the riot, Bargar lost control of the firearm—seemingly, either because the firearm fell from Bargar's person or because Bargar intentionally discarded it—and was later recovered by an MPD officer. The nature and circumstances of Bargar's offense—which include not only carrying a loaded gun during a violent riot, but also (at a minimum) failing to ensure that the firearm was secured to his person—fully support the government's recommended sentence of six months of incarceration.

### B.  The History and Characteristics of the Defendant

As illustrated by the Presentence Report, Bargar had no prior criminal history. However, a charitable interpretation of Bargar's actions indicate, at the very least, a reckless disregard for gun laws and basic gun safety. Another reasonable interpretation is that Bargar brought a loaded gun

13

to the Capitol because he was going into the "belly of the beast" and expected to use the firearm to advance his overall objective—to "Stop the Steal."

C.   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Although Bargar did not enter the Capitol on January 6th, he was among hundreds of rioters who threatened the peaceful transition of power by storming Capitol grounds. Further, Bargar brought a loaded firearm into the District of Columbia, where it is illegal to possess a firearm without a license, and carried it with him onto restricted Capitol grounds during a full-scale riot where police were being assaulted by all manner of weapons. Moreover, Barger was not carrying the gun merely for show, as it was operable and loaded. Had MPD not recovered the gun, another rioter could have picked it off the ground and used it.

The seriousness of Bargar's conduct, particularly his possession of a loaded firearm, is evident from Lt. J.B.'s account of January 6th, which was provided during an interview with FBI agents. Lt. J.B. was initially on the West Plaza, where he recovered Bargar's firearm. Sometime after recovering the gun, Lt. J.B. received a radio call to fall back to the Lower West Tunnel. While trying to push rioters out of the tunnel, Lt. J.B. heard radio communication that the Capitol had been breached. Lt. J.B. initially believed only one individual had breached the Capitol. When he heard reports that someone had been shot, he assumed it was a rioter who shot police because he was aware of multiple reports of firearms in the crowd and had already recovered Bargar's firearm. He believed the officers holding the tunnel were the last line of defense of the Capitol. When considering the use of force to repel rioters, Lt. J.B. was concerned that the crowd would shoot

14

back with firearms, and that they would be able to shoot a lot of officers quickly because everyone was jammed together. At some point during his time in the tunnel, Lt. J.B. used the code 10-33, an emergency code for officers/officers in distress, which Lt. J.B. used only one time previously during his 18-year policing career.

Lt. J.B.'s description demonstrates the seriousness and precariousness of the situation on the ground on January 6th. Bargar's presence and introduction of a deadly weapon—into what was essentially a powder keg—could have dramatically escalated the already-violent riot, had it not been for the restraint of responding police officers, despite facing physical harm themselves.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration. Bargar brought a loaded gun to a riot. The "defense" often parroted by January 6th defendants that they did not travel to D.C. planning for violence is one that Bargar cannot credibly invoke. Bargar insists that he did not

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

expect violence yet brought a loaded gun for "protection." His own statement that he was going into the "belly of the beast" and therefore brought "protection" implies the expectation of violence. His post on Facebook with the hashtag "Par[t]iallypeacefulprotest" supports the same inference.

The need for specific deterrence is also important given (1) Bargar's continued inability to appreciate the distinction between legitimate political discourse and riotous violence; and (2) his apparent continued disregard for gun laws. In October 2021, Bargar saved the following image on his cellphone:



*Image 12: Picture Recovered from Bargar's Cellphone*

The fact that, nearly ten months after the January 6th attack, Bargar seemed to continue denying the attack's unlawfulness indicates that Bargar had no immediate remorse for his actions.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Bargar stands out from almost all other January 6th defendants because he carried a loaded gun onto restricted Capitol grounds. To date, only one other January 6th defendant has been sentenced for carrying a firearm into the Capitol's restricted area—Guy Reffitt. *United States v. Reffitt*, D.D.C. 21-cr-32 (DLF), Aug. 1, 2022 Sent. Hrg. Tr. In sentencing Reffitt, Judge Friedrich noted, "It is true that Mr. Reffitt did not use or otherwise brandish his firearm . . . Still, as I've explained, his carrying of a firearm, which I think it's fair to infer was a loaded firearm, at the scene of the January 6 riots substantially heightened the risk of serious injury to law enforcement officers who courageously defended the Capitol, as well as everyone else who was present that day, Mr. Reffitt included." *Id.* at 164-65. In addition to carrying a firearm, Reffitt assisted and encouraged other rioters on the Capitol grounds, and was convicted of the same charge as Bargar plus four additional felonies, including 18 U.S.C. §§ 1512(a)(2)(C) and (c)(2). Judge Friedrich sentenced Reffitt to 87 months' incarceration.

Another January 6 defendant who carried a weapon less dangerous than a firearm also received a significant sentence of incarceration. *See United States v. Eric Christie*, D.D.C. 23-cr-5 (APM). Christie wore a metal hammer on his belt buckle. He also encouraged other rioters on the Capitol grounds with a bullhorn. And, after January 6th, created a dangerous situation when

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

he refused to submit to arrest. For his convictions under 18 U.S.C. §§ 1752(a)(1), (b)(1)(A) and 1752(a)(2), (b)(1)(A), Christie was sentenced to 11 months of imprisonment. Compared to Christie's 11 months, a six-month sentence is appropriate here, where Bargar did not encourage the riot or refuse to submit to arrest, but did carry a firearm (as opposed to a hammer). A firearm is clearly a dangerous weapon and presents an even more immediate danger of bodily injury than other items (e.g., hammer, knife, stun gun, flagpole, OC spray) carried by rioters on January 6th. *E.g.*, *United States v. Eric Christie*, D.D.C. 23-cr-5 (APM) (hammer); *United States v. William Watson*, D.D.C. 21-cr-513 (RBW) (knife and stun gun); *United States v. Aiden Bilyard*, D.D.C. 22-cr-34 (RBW) (pepper spray); *United States v. Thomas Smith*, D.D.C. 21-cr-599 (RBW) (pole).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bargar must pay $2,000 in restitution, which reflects in part the role Bargar played in the riot on January 6th.[6] Plea Agreement at ¶ 11. As noted in the plea agreement, the riot at the United States Capitol caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 17, 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Bargar's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 105.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of six months incarceration, three years of supervised release, $2,000 in restitution, and the mandatory assessment of $100 for the felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   /s/ *Sarah C. Martin*
Sarah C. Martin
Assistant United States Attorney
Bar No. 1612989
555 Fourth Street, N.W.
Washington, DC 20530