UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEROD BARGAR,<br><br>    Defendant. | Crim. Action No. 1:23CR78 |

### MEMORANDUM IN AID OF SENTENCING

Jerod Bargar will be before the Court for sentencing on January 9, 2024, after having accepted responsibility for possessing a firearm at the U.S. Capitol on January 6, in violation of 18 U.S.C. § 1752 (a)(1), (b)(1)(A). Mr. Bargar offers no objection to the PSR's calculated guideline range of 0 to 6 months.

Mr. Bargar was born and raised in rural Missouri, where it is common for residents to lawfully carry firearms on a daily basis. When he traveled to Washington, D.C., to attend the rally to support the former president, he carried his firearm as he does almost every day. Mr. Bargar had no intention of using the firearm to assault or threaten anyone. He did not use it to assault or threaten anyone. As a result of the instant conviction, he will lose Second Amendment right to carry a firearm. For Mr. Bargar in particular, who enjoyed annual hunting trips with close friends, this a significant collateral consequence and it has driven home the message that he was wrong to disregard federal law as it relates to the possession of firearms.

Counsel respectfully submits that application of the factors set forth in 18 U.S.C. § 3553(a) militates in favor of a sentence that recognizes that imprisonment

is, at best, an imperfect sanction, especially for Mr. Bargar, whose sole non-violent possession offense represents a single deviation from a life of ethical conduct and adherence to the law. Instead, a sentence of probation will fairly reflect Mr. Bargar's lack of criminal history, his unlikelihood of recidivism, his perfect compliance with supervision, and the non-violent nature of his offense. A sentence of probation will also fairly account for the significant collateral consequences that attend to Mr. Bargar's felony conviction.

## Background

On January 6, 2021, Jerod Bargar traveled from his home in Centralia, Missouri to the U.S. Capitol with his cousin with the purpose of supporting former President Trump. Before leaving home, he reflexively put on his holster and firearm, which he is permitted to openly carry without a permit in Missouri.[1] While in the crowd on the grounds (Mr. Barger never entered the building), the firearm was loosened from his waist and fell to the ground, where law enforcement later recovered it. Agents subsequently interviewed Mr. Bargar and he freely admitted the firearm was his. He was arrested on August 4, 2022, and charged by complaint with various offenses related to his possession of the firearm on Capitol grounds. On June 8, 2023, Mr. Bargar pleaded guilty to a one count Information charging him with entering and remaining in a restricted building or ground with a deadly weapon, in violation of 18 U.S.C.§ 1752(a)(1) and (b)(1)(A). Pursuant to his plea agreement, he has agreed to

---

[1] Missouri allows people to carry concealed, loaded firearms in public without a background check or permit. *See* https://giffords.org/lawcenter/gun-laws/states/missouri/

pay $2000 in restitution to the architect of the Capitol, though he personally did not cause damage to the Capitol. As the PSR makes clear, $2000 represents a significant sum for Mr. Bargar and his family. Mr. Bargar has since complied with the pre-sentence investigation. Initially, a sentencing hearing date was scheduled on November 3, 2023.

On October 18, 2023, Mr. Bargar was admitted to the hospital with severe abdominal pain. Doctors discovered that he had a dangerous infection and operated immediately. In order to remove the infection, doctors removed a portion of his intestines and he now wears a colostomy bag. As the Court will recall, Mr. Bargar's November sentencing hearing had to be continue because his doctor recommended that he not travel following this surgery. Mr. Bargar is scheduled have "reconnection surgery" on January 16, 2024. Following this surgery, the hope is he will no longer have to wear a colostomy bag. On January 9, 2024, Mr. Bargar will stand before the Court prepared to accept punishment for his aberrant lack of judgment three years ago.

**I.   The sentencing factors support a probationary sentence.**

**A. Mr. Bargar's history and characteristics show that probation is appropriate.**

As the over 20 attached letters attest, Mr. Bargar is a beloved and respected family man in his small town. Indeed, members of his close-knit community, including the Superintendent of the school district, Mr. Bargar's former science teacher, and his ex-wife, universally described him as a kind-hearted, gentle, devoted

3

family man.[2] At least a couple of community members describe Mr. Bargar as a "gentle giant."[3] The life he led up to January 6 and after show that a sentence of probation is appropriate.

i. **Mr. Bargar grew up in rural Missouri in a loving but fractured working-class family.**

Jerod Bargar was born in 1986 in Columbia, Missouri. He was raised in Centralia, Missouri, a small town of approximately 5000 people. His mother, Sharon, worked in the medical field. His father, John, worked as a maintenance worker. Sharon and John divorced when Jerod was approximately 12 years old. At the time, Jerod's father was drinking heavily, which contributed to the divorce. The divorce was hard on Jerod—as many children of divorce do, he went back and forth between his mother and father's homes until the family court let him decide which parent to live with permanently. Initially, he lived with his mother who had moved to a different county. Jerod missed Centralia and after about one year, he moved in with his father, who still lived in Centralia. Reflecting on those years, Jerod understands that the instability and moving around affected him in adverse ways. That said, he has taken the lessons he learned as a child of divorce and has done everything in his power to ensure that his children enjoy a stable childhood and feel loved and supported.

---

[2] *See e.g.* Letter of Dr. John Rinehart, letters attached hereto as Exhibit 1.
[3] Letters of Jill Griggs

### ii. Mr. Bargar puts his family first; he is widely regarded as a committed family man.

Jerod graduated from Centralia High School. Following high school, he worked as a landscaper on a sod farm. He met and married his first wife, Nena, when he was 23 years old. They had two children together. The couple divorced after four years. Not wanting his children to experience the trauma he did when his parents divorced, Jerod did everything he could to support his children through the divorce. Indeed, his ex-wife writes, "from the day of our children's births, Jerod has been there for them 100%."[4] Jerod married his current wife, Haley, in 2016. Haley has a child from a prior relationship and she and Jerod have a child. Jerod embraces his role as father to the four children of his blended family. Many of his community members observe that Jerod is a devoted family man. For example, one long-time friend writes, "I watched [Jerod] work extremely hard to provide for his family but always taking the time to help someone in need."[5] Another community member observed, "any time I see Jerod him and his wife are always there supporting their children in whatever school activities and/or community events."[6] Another friend writes that Mr. Bargar "works every day, and when he has a day off, he is still working on something in the home, for his wife because his love for his family is unending."[7]

Photo of Jerod and his family:

---

[4] Letter of Nena Yager.
[5] Letter of Megan Conrad
[6] Letter of Ashley Bell
[7] Letter of Stephanie Sanders

5



### iii. Mr. Bargar has been consistently employed and is a valued employee.

After graduating from high school, Mr. Bargar worked on a sod farm. Through his work on the farm, he traveled around the country helping to construct sports fields for schools. In 2008, he returned to Centralia and joined a landscaping company, Columbia Landcare, where he worked for eleven years. Mr. Bargar's former supervisor, Ashley Cooper, writes that Mr. Bargar "consistently displayed professionalism, organization, integrity, and reliability in his role at Columbia Landcare."[8]

In early 2020, Mr. Bargar left the landscaping business to pursue a career in insurance. He is currently employed an insurance representative at Partners Central. According to records received by the Probation Officer, Mr. Bargar is "noted as being a responsible, reliable, and knowledgeable individual in his position." PSR ¶ 72. One of Mr. Bargar's customers, Ashley Bell, who purchased homeowners insurance from Mr. Bargar explains how Mr. Bargar helped her find the best insurance and even

---

[8] Letter of Ashley Cooper

noticed when insurance was not properly offered in the sale of her home. She writes that Mr. Bargar's "dedication to his serving his customers, community, and friends means a lot."[9]

### iv. Mr. Bargar is known for his moral and peaceful character.

The attached letters paint a fuller picture of Mr. Bargar than undersigned counsel can. Indeed, the Superintendent of the West Platte school district took the time to write the following about Mr. Bargar:

> As someone who has been in education for 31 years Mr. Bargar still stands out in my mind for his honesty, and his embrace of actions that generally tend to his doing 'the right thing.' Although he has always been a physically big person, his heart was always equally big. I never observed him doing anything mean towards anyone else. There is not a malevolent bone in his body, at least not revealed to me over 24 years. As a coach you often you often an opportunity to see young men at their best and at their worst. Every test of character that came his way, in my observation, his better angels prevailed. He has always been someone who could be counted on when others may sway. He has always been respectful towards his peers, teachers, coaches, and colleagues.

Letter of Dr. John Rinehart.

Dr. Rinehart's letter is joined by a chorus of neighbors and friends who attest to Mr. Bargar's good character. Just by way of a few examples:

- "[Jerod] has always been a respected person I in the community. . ."[10]

- "I have seen personally how [Jerod] volunteers to coach the youth in our community sports and how he interacts with anyone in our community and I think it is safe to say that we all think of Jerod as a gentle giant."[11]

---

[9] Letter of Ashley Bell
[10] Letter of Alicia Walter
[11] Letter of Jill Griggs

7

- "Jerod is always willing to lend a hand. Just last summer, my grandfather was on hospice and went downhill quickly. Early one morning, he was unable to get out of bed. Jerod rushed to my parents' house and lifted him up and cared for him. Jerod didn't have to do that, but he did with no questions asked."[12]

The outpouring of support from Mr. Bargar's community and attestations to his good character and overall respect for the law amply demonstrate that offense on January 6 was an aberration and that the Court can rest assured that he will never again break the law.

v. **Mr. Bargar's recent health issues would make any term of imprisonment more punishing than is warranted for his non-violent offense**.

As the attached letters from Mr. Bargar's doctors show, Mr. Bargar recently suffered a significant health episode. He underwent massive abdominal surgery from which he has still not recovered. One week after the sentencing hearing, he will undergo yet another substantial surgery. Any period of incarceration could delay or, worse, compromise his full recovery. Undersigned counsel submits this is too draconian a consequence for his possession offense and respectfully requests that, if the Court is considering imposing incarceration, to impose home incarceration instead.

**B. The nature and circumstances of Mr. Bargar's possession offense militate in favor of probation**.

The facts of this case are straightforward and uncontested: Mr. Bargar traveled to Washington, D.C., with a firearm that he lawfully carries in his home

---

[12] Letter of Vanessa Ridgel

state. Prior to traveling, he did not look into whether he is permitted to carry a firearm in the District of Columbia. While at the rally, while assisting another rally-goer, the firearm fell to the ground. He never intentionally took the firearm out or used it any way. Prior to January 6 and after January 6, Mr. Barger did not post any bellicose messages about January 6. He wore street clothes to the rally. When officers later interviewed him, he freely admitted that the firearm was his and he had dropped it. This is because he never had any intention to do anything other than peacefully support the president he supported.

Bringing his firearm was a reckless and aberrant lack of judgment on Mr. Bargar's part. He knows he was wrong to disregard federal law and he has accepted responsibility by pleading guilty to a felony offense, which will strip him of his Second Amendment right to carry a firearm for self-defense. That said, Mr. Bargar did not arm himself with the purpose of threatening or injuring anyone.  The only reason Mr. Bargar came to the rally was to support the former president. He did not post or discuss with anyone any plan other than supporting the president at what he thought would be a peaceful, energetic Trump rally. *The video and other evidence makes abundantly clear that Mr. Bargar did not, in fact, threaten or injure anyone.*

Mr. Bargar's conduct and private expressions of remorse to his loved ones after January 6 also show that probation is appropriate for Mr. Bargar. Several of his loved ones have written to the Court about their conversations with Mr. Bargar in which he has expressed regret for bringing a firearm into what became a dangerous

9

situation.[13] For example, Mr. Bargar's mother, Sharon, writes that Jerod "respects all laws and is remorseful that he violated the law and that he made a situation more dangerous by bringing a gun."[14]

### C. A probationary sentence will avoid unwarranted disparities.

Mr. Bargar's case is difficult to compare to other January 6 defendants because to date, no other defendant has been sentenced on a sole count of 1752(b)(1)(A).

## II. A sentence of two years of probation, in addition to the significant collateral consequences that Mr. Bargar has and will experience, will promote the goals of sentencing.

A sentence of two years of probation would address the § 3553(a) factors and provide a just result in this case. It is a meaningful sentence, during which Mr. Bargar's liberty will be significantly curtailed. It is also a fair sentence — one that would enable Mr. Bargar to continue working to save towards restitution and one that will allow him to properly heal from his recent surgeries.

### i. Just Punishment

Mr. Bargar never intended to threaten or use the firearm he lawfully carries in his home state on January 6. He accepts that punishment of his conduct is appropriate. The loss of his Second Amendment Right is a significant punishment in and of itself. Mr. Bargar grew up hunting with his father. Every year, he has enjoyed going hunting with a group of friends from his town. It is a bonding tradition that he will sorely miss now that he can no longer hunt. The sentencing court can and should

---

[13] *See e.g.*, Letter of Sharon Nelson and Haley Bargar.
[14] Letter of Sharon Nelson

10

take these collateral punishments into account in fashioning a sentence. *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure from sentencing guidelines where defendant was already punished by the loss of his business as a result of his EPA-related charges); *see also United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (holding that a court may properly consider the host of collateral consequences that attend a felony conviction, including loss of benefits and difficulty finding future employment, when fashioning a sentence).

### ii.     Incapacitation, Deterrence, and Respect for the Law.

A sentence of two years probation, when paired with the significant collateral consequences Mr. Bargar will sustain, is more than sufficient to have a deterrent effect. There is no question that Mr. Bargar poses little risk of recidivism. In addition to his law-abiding conduct prior to and after January 6, the Sentencing Commission has also objectively quantified his low likelihood of recidivism. Specifically, the Commission has found that first offenders like Mr. Bargar are rarely reconvicted of a crime. In fact, only three-point-five percent (3.5%) of first offenders with zero (0) criminal history points are ever reconvicted.[15] The applicable guideline range here reflects this understanding about first offenders. Probation is a guideline-compliant sentence.

---

[15] *See U.S. Sentencing Comm'n, Recidivism and the First Offender* (May 2004); available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

Moreover, Mr. Bargar will not simply go free; he will have an additional lengthy period of supervision and community confinement if this Court orders it as a condition as well as lose his right to possess a firearm. That sends a message to the public that disregarding firearms prohibitions that may be different than in one's home state will be punished. And, indeed, the most effective deterrent is the *certainty* of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (" … given that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques."); *see also The Growth of Incarceration in the United States*, Nat'l Resource Council, at 131 (2014) ("[O]ne of our most important conclusions is that the incremental deterrent effect of increases in lengthy prison sentences is modest at best.")

Finally, a sentence that accounts for the individual as a whole and recognizes prison is not always an appropriate sanction, especially for non-violent first offenses, will show respect for the law. A sentence of probation complies with 28 U.S.C. § 994(j), which directs that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense.

## Conclusion

For the reasons herein and any others that appear to the Court, Jerod Bargar respectfully submits that a sentence of probation with conditions and restitution is sufficient but no greater than necessary to meet the goals of sentencing.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500